# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ALAN L. SIMMONS**
        **Petitioner,**

     **v.**                                    **Case No. 10-C-1137**
                                                  **(Criminal Case No. 07-CR-30)**

**UNITED STATES OF AMERICA,**
        **Respondent.**

## DECISION AND ORDER

Petitioner Alan Simmons filed a motion pursuant to 28 U.S.C. § 2255 to vacate his convictions of conspiracy to commit armed bank robbery and related offenses, arguing, inter alia, that his lawyer provided ineffective assistance in failing to call him to testify in support of a withdrawal defense. Because the record plainly shows that petitioner personally decided not to testify, that counsel made a reasonable strategic decision in advising petitioner not to testify, and that there is no reasonable probability that presentation of a withdrawal defense would have changed the result, I deny the motion and dismiss this action.

## I. BACKGROUND

The government charged petitioner with conspiracy to commit armed bank robbery, 18 U.S.C. § 371, armed bank robbery, 18 U.S.C. § 2113(a) & (d), and brandishing a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c). The charges arose out of a plan devised by petitioner, his friend Antonio Mann, and his cousin Mark Campbell to rob the Ozaukee Bank in Cedarburg, Wisconsin. Mann first got the idea to commit the robbery after his girlfriend Jaclyn Schmidt, a teller at the bank, commented on its lax security. Mann shared

the idea with petitioner, who agreed to participate and recruited Campbell to help. The three traveled to Cedarburg to scout the bank, then returned to attempt the crime. During their first attempt, Campbell and Mann tried to enter the bank using a key Mann copied from Schmidt's key-ring, while petitioner acted as the lookout, but the plan failed when the key would not turn the lock.[1]

After the failed attempt, Campbell wavered on trying again, but petitioner persuaded him to continue by coming up with a better plan under which they would abduct Schmidt from her apartment in the middle of the night and force her to go to the bank and open the vault. Pursuant to the revised plan, Mann admitted Campbell to the apartment he shared with Schmidt at about 3:00 a.m., Campbell woke Schmidt, displayed a firearm, and stated that they were going to the bank. Schmidt advised Campbell that she could not open the vault without the access code of a second teller, so they waited until just before 7:00 a.m., when the bank opened. Campbell then directed Schmidt to drive to the bank, where they awaited the arrival of the second teller. When the other teller entered the bank, Campbell grabbed her from behind, forced her to the ground, and demanded the code. Schmidt then opened the vault, Campbell took $177,500 and fled with Mann, who was waiting in a truck outside. The two returned to Milwaukee, where they shared some of the proceeds (a total of $30,000) with petitioner, who had remained behind (ostensibly to watch his children) but stayed in contact with Mann by phone.

Mann and Campbell pleaded guilty and agreed to cooperate with the government, and at petitioner's trial they testified as to the events set forth above. The government also

---

[1]Andrea Johnson, a girlfriend of petitioner's, unwittingly drove him to Cedarburg during the first, failed attempt to rob the bank.

presented telephone records corroborating the phone traffic between petitioner and Mann during the robbery; cell site data confirming Mann's physical location during and after the robbery; evidence regarding petitioner's large cash purchases (some made using a false name and while accompanied by Mann) following the robbery, despite his lack of a legitimate income; and recorded jailhouse phone calls between petitioner and his co-conspirators in which they spoke in coded language about the robbery and sought to assure petitioner they would not "snitch." Petitioner elected not to testify and rested without presenting a defense case. The jury convicted him on all counts.

I ordered a pre-sentence report ("PSR") and set the case for sentencing. The PSR recommended an offense level of 28 on the conspiracy and robbery counts: base level 20, U.S.S.G. § 2B3.1(a), plus 2 because the property of a financial institution was taken, § 2B3.1(b)(1), plus 4 based on Schmidt's abduction, § 2B3.1(b)(4)(A), and plus 2 based on the loss amount, § 2B3.1(b)(7)(C). Coupled with petitioner's criminal history category of I, the PSR recommended a guideline range of 78-97 months on the conspiracy and robbery counts. The § 924(c) count carried a mandatory seven year consecutive sentence, as Campbell brandished the firearm during the robbery. See 18 U.S.C. § 924(c)(1)(A)(ii); U.S.S.G. § 2K2.4(b).

At sentencing, petitioner objected to the abduction enhancement, arguing that Schmidt was actually a co-conspirator rather than a victim, and sought a minor role reduction under U.S.S.G. § 3B1.2 based on the fact that he was not physically present at the time of the robbery. The government sought an enhancement for obstruction of justice under U.S.S.G. § 3C1.1 based on petitioner's pre-trial attempt to solicit false testimony from a witness, Shauntay Edwards, that she had borrowed petitioner's phone on the day of the robbery to call Mann about a broken date, thus explaining the phone traffic between petitioner and Mann's

3

phones.[2]  I resolved the guideline issues in the government's favor, adopting a range of 97-121 months on the conspiracy and robbery counts, then imposed a sentence of 60 months (the statutory maximum) on count one and 96 months on count two, those sentences to run concurrently, and 84 months on count three to run consecutive to the sentences on counts one and two, for a total of 180 months; a total of five years' supervised release; and $177,500 in restitution.

Petitioner appealed, arguing that the evidence was insufficient to show that a teller's life was put in jeopardy during the robbery as required by § 2113(d), or to support his § 924(c) conviction under a conspiracy theory; that the prosecutor improperly used his mug shot and vouched for a witness during closing arguments; and that I improperly increased his sentence under U.S.S.G. § 2B3.1(b)(4)(A) based on Schmidt's abduction.  The Seventh Circuit rejected these arguments and affirmed.  United States v. Simmons, 581 F.3d 582 (7th Cir. 2009), cert. denied, 130 S. Ct. 2122 (2010).

Petitioner then filed the instant motion, arguing that his lawyer provided ineffective assistance of counsel by (1) failing to object to the presence of two government "case agents" exempt from sequestration at trial, (2) failing to call petitioner to testify and to present a withdrawal defense, and (3) requesting that the jury find him guilty during closing arguments. He also argued that I erred in ordering him to participate in the Inmate Financial Responsibility Program ("IFRP") as a means of paying restitution.  Pursuant to Rule 4 of the Rules Governing Section 2255 Proceedings, I conducted a preliminary review of the motion, denying the first and third ineffective assistance claims and the IFRP claim.  Despite harboring serious doubts about

---

[2]Edwards was not called at trial, but the guideline covers attempts to obstruct.

the withdrawal claim, out of an abundance of caution, I directed the government to respond on that issue.

The government obtained an order of waiver of petitioner's attorney-client privilege with respect to the matters placed at issue in the § 2255 action, see, e.g., United States v. Pinson, 584 F.3d 972, 977-78 (10th Cir. 2009), then filed a response accompanied by an affidavit from petitioner's trial counsel. Petitioner replied, and the matter is now ready for final decision.

## II. DISCUSSION

### A. Applicable Legal Standard

In order to demonstrate ineffective assistance of counsel, petitioner must show two things. First, he must show that his "counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 687 (1984). "Review of trial counsel's performance 'must be highly deferential' and 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Smith v. Gaetz, 565 F.3d 346, 352-53 (7th Cir. 2009) (quoting Strickland, 466 U.S. at 689). Petitioner must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Id.

Second, petitioner must show prejudice based on counsel's errors. This requires him to demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Speculation that the result would have been different had counsel pursued a different line of

defense will not suffice. United States v. Williams, 934 F.2d 847, 852 (7th Cir. 1991).

In order to obtain a hearing on his claim, petitioner must present a detailed and specific affidavit which shows that he has genuine proof to support his allegations. Prewitt v. United States, 83 F.3d 812, 819 (7th Cir. 1996). A hearing is not required if the petitioner makes conclusory or speculative allegations rather than specific factual allegations. Gallo-Vasquez v. United States, 402 F.3d 793, 797 (7th Cir. 2005). Nor will a mere assertion, even if made under oath, require a hearing on a claim that the petitioner's right to testify in his own defense was denied. Clark v. Underwood, 939 F.2d 473, 476 (7th Cir. 1991).

**B.    Analysis**

Petitioner argues that he was denied a fair trial due to his lawyer's failure to prepare him to testify and for failing to call him to testify in support of a withdrawal defense. He claims that well in advance of trial he told counsel that his defense would include taking the stand to testify that he had withdrawn prior to the actual robbery of the bank. He states that he made clear to counsel that his only defense was that he had withdrawn from the conspiracy to rob the bank. (Motion at 8; Simmons Aff. ¶¶ 6, 12.)

Petitioner explains that Mann and Campbell told him that Schmidt would cooperate, so there would be no need for violence. However, just prior to the robbery Mann and Campbell indicated that if Schmidt refused to help they would kidnap and/or threaten to kill her child. Petitioner claims that at that point he told Campbell and Mann that he would have nothing to do with kidnapping or threatening a child and that he wanted out of the plan. (Motion at 8-9; Simmons Aff. ¶ 7.) Mann called him numerous times to try to persuade him to participate, but he declined. Petitioner states that the only reason he spoke to Mann during the course of the robbery was to make sure they were not harming the child or threatening Schmidt; Mann

6

assured him they were not. Petitioner claims that if he had learned otherwise he would have called the police. He further claims that the reason he stayed home during the robbery was not because he had to babysit but because he was no longer involved. (Motion at 10; Simmons Aff ¶¶ 7-10.)

Petitioner concludes that his lawyer refused to prepare him to testify that he had withdrawn from the conspiracy and refused to call him to testify during the trial. He says that counsel told him that if he took the stand the government would be allowed to expose the fact that he was a convicted felon with a drug trafficking conviction, which would hurt his case. (Motion at 11; Simmons Aff. ¶ 12.)

A defendant's right to testify is personal to him and may not be waived by counsel on his behalf. See, e.g., Rock v. Arkansas, 483 U.S. 44, 51-53 (1987); Ward v. Sternes, 334 F.3d 696, 705 (7th Cir. 2003); Underwood, 939 F.2d at 475. However, the record in this case conclusively shows that petitioner made the decision not to testify. At trial I engaged in the following colloquy with petitioner and counsel:

> THE COURT: Okay. And now, normally I don't actually advise defendants, but I'm glad to if you want me to, about their right to testify. Basically my understanding is that you've advised the defendant that he has a right to testify if he wants to and he's not going to, is that –
>
> MR. CUBBIE: That's correct, Judge. I'm going to ask Mr. Simmons to confirm my statement that I'm about to make to the court.
>
> Mr. Simmons and I decided this morning that strategically he will not testify; that that is in his best interests. Mr. Simmons has given this thought, as have I over the last few weeks, we've discussed it, and we've engaged in some preparation sessions in the event that we thought – in the event that we decided jointly that he would testify. But on my recommendation Mr. Simmons is not going to testify.
>
> THE COURT: Mr. Simmons, do you concur with that?

THE DEFENDANT: Yes.

THE COURT: Okay, very good. Okay.

(Trial Tr. at 500-01.)

Petitioner acknowledges this colloquy but claims that the court "did not ask [him] if he wanted to testify only if he concurred with Mr. Cubbie's recommendation that he not testify." (Motion at 12.) The record clearly shows that petitioner made a personal decision not to testify and refutes any claim that counsel prevented him from doing so. See Taylor v. United States, 287 F.3d 658, 662 (7th Cir. 2002) (noting that putting this information on the record can avoid later collateral attacks, and that counsel's initiation of the colloquy avoids the risk that a judge-initiated inquiry will interfere with the attorney-client relationship).

Petitioner claims that his "decision not to testify was based on [counsel's] mental coercion that overcame [his] will to exert [his] right to testify." (Simmons Aff. ¶ 13.) As the Seventh Circuit stated in rejecting a similar claim in Underwood, this "is too facile a tactic to be allowed to succeed. Some greater particularity is necessary – and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify – to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim." 939 F.2d at 476. Just so here. Some substantiation, beyond petitioner's say-so, is needed to warrant holding an evidentiary hearing on a claim of coercion.[3]

---

[3] In his supporting memorandum, petitioner argues that I failed to explain that the decision was his to make. (Pet.'s Memorandum at 10.) However, the Constitution imposes no such obligation on the court. See, e.g., United States v. Manjarrez, 258 F.3d 618, 623 (7th Cir. 2001); Liegakos v. Cooke, 106 F.3d 1381, 1386 (7th Cir. 1997); United States v. Thompson, 944 F.2d 1331, 1345 (7th Cir. 1991).

8

Petitioner further argues that he agreed not to testify only because his lawyer did not agree with his withdrawal defense and would not prepare him to present it. (Motion at 12.) He claims that counsel presented no defense and gave the jury no reason to find him not guilty. He argues that had counsel developed a withdrawal defense and called petitioner to testify there would have been a different outcome. (Motion at 13.)

In his affidavit, counsel avers that petitioner never expressed a desire to rely on a withdrawal defense; such a defense would have required petitioner to acknowledge initially joining the scheme, which he never admitted. (Cubbie Aff. ¶ 2.) Counsel further indicates that he advised petitioner that the case against him was strong, and that he would be convicted because there was no alternative explanation for the volume of phone calls between petitioner and Mann during the robbery or for petitioner's large cash expenditures after the robbery. (Cubbie Aff. ¶ 3.) In response, petitioner provided various explanations for the source of funds (e.g., his father gave him the money, he earned income from vending machines, he had a job moving furniture), none of which counsel could confirm through investigation. (Cubbie Aff. ¶¶ 4-6.) Petitioner also expressed a desire to call Edwards to explain the volume of calls between his and Mann's phones. Counsel was skeptical of Edwards's story, and counsel later learned that she had lied and expected to be paid for her testimony. (Cubbie Aff. ¶ 7.) Finally, counsel avers that he advised petitioner not to testify because petitioner would be destroyed on cross examination because he would not be able to explain the phone calls and expenditures; petitioner followed his advice and chose not to testify. (Cubbie Aff. ¶ 8.)

In his reply, petitioner argues that the government should not have been allowed to present a pre-hearing affidavit from counsel containing privileged communications. However, it is well-settled that a defendant claiming ineffective assistance of counsel "puts

9

communications between himself and his attorney directly in issue, and thus by implication waives the attorney-client privilege with respect to those communications." United States v. Pinson, 584 F.3d 972, 977-78 (10th Cir. 2009), cert. denied, 130 S. Ct. 1548 (2010); see also Bittaker v. Woodford, 331 F.3d 715, 716 (9th Cir. 2003) ("It has long been the rule in the federal courts that, where a habeas petitioner raises a claim of ineffective assistance of counsel, he waives the attorney-client privilege as to all communications with his allegedly ineffective lawyer."); Garcia v. Zenith Electronics Corp., 58 F.3d 1171, 1175 n.1 (7th Cir. 1995) ("We note that the attorney-client privilege is generally waived when the client asserts claims or defenses that put his attorney's advice at issue in the litigation.").

Petitioner further complains that he cannot cross-examine counsel's affidavit to show that it contains falsehoods. However, petitioner presents no evidence refuting counsel's statements. Indeed, he admits that his initial affidavit was "somewhat misleading" in claiming that prior to trial he told counsel he wanted to rely on a withdrawal defense. (Pet.'s Reply Br. at 7.) He now admits that he did not use those words and blames the inmate law clerk assisting him. Further, the court may in deciding a § 2255 motion receive affidavits and rule by parallel to Fed. R. Civ. P. 56, the summary judgment rule. See Taylor v. United States, 287 F,3d 658, 661 (7th Cir. 2002). The record in this case contains no genuine dispute of material fact, so I deny the motion without an evidentiary hearing.[4] See id. The record plainly shows that counsel pursued the reasonable trial strategy of arguing that petitioner had no involvement in the robbery plan and that petitioner suffered no prejudice from counsel's failure to pursue a withdrawal defense.

---

[4] To the extent that petitioner does raise disputes of fact between his version and counsel's, I need not resolve them in order to decide the motion.

10

Counsel vigorously contested the government's evidence, seeking to discredit Mann and Campbell, who provided the only direct evidence linking petitioner to the crime. Counsel pointed out that both had a strong motive to curry favor with the government; that Mann had reason to be angry with petitioner because petitioner did not, when initially questioned by the FBI, back Mann's alibi; that Campbell and Mann made prior inconsistent statements about the robbery; and that their versions of events differed. (E.g., Trial Tr. at 25-28.) Counsel also sought to poke holes in the government's expenditure evidence, pointing out that, aside from a jewelry store employee, none of the government's witnesses actually sold petitioner the items listed in the business records submitted.

Even if I assume that petitioner told counsel that he was initially involved but then backed out of the plan, and that counsel should from this statement have understood petitioner to be suggesting a withdrawal defense (as petitioner argues in the reply brief), petitioner fails to show that counsel provided ineffective assistance. A withdrawal defense would have required petitioner to admit that he joined the scheme and to then come forward with proof that he withdrew from it. See United States v. Julian, 427 F.3d 471, 483 (7th Cir. 2005). The strategy counsel actually pursued left the burden on the government.

Further, as the Seventh Circuit has stated, "'[i]t is not . . . all that easy to withdraw from a conspiracy.'" United States v. Hall, 212 F.3d 1016, 1023 (7th Cir. 2000) (quoting United States v. Bafia, 949 F.2d 1465, 1477 (7th Cir. 1991)). "In order for a defendant to withdraw from a conspiracy in the legal sense, he must take some affirmative act to defeat or disavow the criminal aim of the conspiracy, such as submitting himself to the authorities or announcing to his co-conspirators that he is withdrawing." Julian, 427 F.3d at 483. Simply ceasing to participate, even for an extended time, is not sufficient to show withdrawal. Id.

Petitioner fails to explain why counsel should have pursued such a defense, which would have shifted the burden to him, rather than simply attacking the government's proof. In any event, even under his current version of events, a withdrawal defense seems highly unlikely. Petitioner makes no claim that he ever tried to alert the authorities about the robbery or to warn Schmidt of the danger she faced. He claims that he told Campbell and Mann he wanted out after they threatened to harm Schmidt and/or her child, but he admits that after Mann told him that such action proved unnecessary he did nothing (and, as discussed below, later accepted robbery proceeds).

Further, as petitioner acknowledges, in order to present this defense he would have had to take the stand. Petitioner argues that there was no tactical advantage to his not testifying (Pet.'s Memorandum at 11), but the record plainly shows the contrary. First, had he testified, the government could have attacked his credibility based on his previous felony conviction for possession with intent to distribute cocaine. See Fed. R. Evid. 609.

Second, the government could have cross-examined petitioner about his lavish purchases following the robbery, despite his lack of legitimate income, which even now he struggles to explain. In the memorandum supporting his motion, petitioner claims that Campbell and Mann never gave him any money, which he would have said had he been called to testify. (Pet.'s Memorandum at 11.) But he provides no explanation as to how he would have responded to the government's questions about his expensive purchases of jewelry, electronics, and furniture. In his reply brief, petitioner changes tactics and admits that Campbell and Mann did give him money (he's unsure how much), but claims this was a bribe to buy his silence. (Pet.'s Reply at 5.) Such an admission would likely have been fatal to a withdrawal defense. See United States v. Garcia, 114 Fed. Appx. 431, 433 (2d Cir. 2004)

(finding that, even if the defendant had renounced the criminal partnership, his withdrawal claim failed based on his admission that, after the robbery was committed, he met with his co-conspirators and shared in the proceeds of the robbery); United States v. Zimmer, 299 F.3d 710, 718-19 (8th Cir. 2002) (finding no withdrawal where the defendant attempted to cover up the conspiracy and obtain his share of the proceeds); United States v. Berger, 224 F.3d 107, 118-19 (2d Cir. 2000) (noting that, even if the defendant resigns from the enterprise, he must not take any subsequent acts to promote the conspiracy and must not receive any additional benefits from the conspiracy); see also United States v. Emerson, 501 F.3d 804, 811-12 (7th Cir. 2007) (finding no withdrawal where the defendant "was to benefit from the proceeds of the robbery"). Certainly I cannot find that counsel performed deficiently in advising petitioner not to take the stand and tell this story, or that there is a reasonable probability that a jury would have accepted this explanation and acquitted petitioner.

Third, had he testified, the government could have cross-examined petitioner about the phone traffic between his and Mann's phones. Petitioner now says that he made these calls to ensure the safety of Schmidt and her son during the robbery. However, during an interview with the FBI following the robbery, defendant, while admitting that he was on the phone with his friend Mann, denied talking about the robbery. (Trial Tr. at 18-19; 370.) Further, as discussed above, at sentencing the government showed that prior to trial petitioner solicited a woman to falsely say that she was on the phone with Mann during the robbery (using petitioner's phone). I can also see no reasonable probability that a jury hearing this evidence would have acquitted. Nor, even if I assume that petitioner advised counsel of his alleged concern for Schmidt's safety, can I find that counsel performed deficiently in advising petitioner not to take the stand and tell such a story.

13

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that petitioner's remaining claim is **DENIED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings, the district court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2255 petitioner. A COA may issue only if the petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard for making a substantial showing is whether reasonable jurists could debate whether the motion should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. Slack v. McDaniel, 529 U.S. 473, 484 (2000). For the reasons stated above and in my previous Rule 4 Order, jurists of reason would not disagree with my conclusions, so I decline to issue a COA.

Dated at Milwaukee, Wisconsin, this 17th day of October, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge